*696
 
 OPINION OF THE COURT
 

 Bellacosa, J.
 

 This CPLR article 78 proceeding seeks review and annulment of the New York City Transit Authority’s determination, under which petitioner-appellant James Rogers was fined $50 for selling his organization’s newspaper on a subway station platform in violation of Rules of the Metropolitan Transportation Authority § 1050.6 (b) (21 NYCRR 1050.6 [b]). The Appellate Division order reversed a Supreme Court judgment in Rogers’ favor, confirmed the Transit Authority determination and dismissed the proceeding. Rogers appeals as of right on constitutional grounds (CPLR 5601 [b] [1]).
 

 The principal, intertwined issues relate to whether (1) the Transit Authority’s adoption and promulgation of regulations for specified distributions of expressive materials on subway platforms transforms those transportation system locations into public forums; (2) Rogers’ sale of. the newspaper is commercial activity subject to the Transit Authority regulation; (3) Rogers’ claimed not-for-profit political campaign activity provides a general immunity from reasonable regulation by reason of supervening First Amendment protections; and (4) the Transit Authority’s particularly applied ruling here, under the challenged regulatory paradigm, meets precedential and constitutional standards of reasonableness and fairness.
 

 We uphold the Appellate Division ruling in favor of the Transit Authority because appellant’s claims do not constitute constitutional deprivations. Rather, the Transit Authority’s regulatory and adjudicative actions are within reasonable constitutional parameters, dictated by its primary and essential public transportation function and responsibility to provide safe and secure services. This case also reflects its reasonable management of a subsidiary role in fairly and evenhandedly controlling the large number and variety of purveyors of ideas, views, goods and services on its stretched network and myriad properties.
 

 L
 

 Rogers is a member of a political organization known as the Socialist Workers’ Party (SWP). On October 30,1993, just prior to the New York City elections, he and other SWP volunteers set up a card table on the mezzanine level of a subway station in Jamaica, Queens, for the purpose of campaigning for their candidates. While Rogers distributed some literature for free,
 
 *697
 
 he offered books and a weekly party newspaper, the Militant, for sale only. In response to a warning from a Transit Authority officer that this sales activity violated Transit Authority rules, Rogers and his associates removed their table from the subway station. Due to inclement weather, they later moved the table back inside, repositioned themselves by the station escalator and resumed their activities, including offering materials for sale. A Transit Authority officer issued Rogers a notice charging him with violating a rule against selling materials of this kind in the subway.
 

 A hearing was held and the Transit Adjudication Bureau (TAB) determined that Rogers violated section 1050.6 (b) by engaging in "unauthorized commercial activity,” and imposed the standard $50 fine. TAB’s Appeals Board sustained the determination. Rogers sued, asserting that he did not receive a fair hearing, that his activities were permitted under 21 NYCRR 1050.6 (c) and that the Transit Authority action violated his right to free speech under the Federal and State Constitutions.
 

 The trial court ruled in Rogers’ favor. It reasoned in part that the "incidental sale of a few copies of a political party’s newspapers during the course of a political campaign does not constitute 'commercial activity.’ ” It further held that "[t]he protection afforded free speech on the street, under the circumstances of the case at bar, can be extended to include the conduct of Petitioner [on the subway premises].”
 

 The Appellate Division unanimously reversed and dismissed the proceeding (227 AD2d 629). The Court held that the Transit Authority’s determination that Rogers violated 21 NYCRR 1050.6 (b) was supportable in that it properly applied the rational rule and was entitled to deference
 
 (id.,
 
 at 630). Addressing the constitutional claim, the Court reasoned that the subway is not a public forum and was not transformed into one by the Transit Authority’s enactment of 21 NYCRR 1050.6 (c), which authorizes certain nontransit activity
 
 (id.,
 
 at 630-631). It concluded that the Transit Authority’s limited expansion of the function of the subway, by the enactment of 21 NYCRR 1050.6 (c), "expressly did not encompass the commercial activity at issue”
 
 (id.,
 
 at 631). We now affirm.
 

 IL
 

 No one disputes that Rogers’ general right to sell books and promote his personal and his organization’s political views
 
 *698
 
 falls within First Amendment protection
 
 (see, Heffron v International Socy. for Krishna Consciousness,
 
 452 US 640, 647;
 
 Murdock v Pennsylvania,
 
 319 US 105, 111). This case is not about that.
 

 Pertinently here, nothing in the Constitution commands that dissemination of all forms of speech at all times on all kinds of property are absolutely protected under the First Amendment, without regard for the nature of the activity, the property or the disruption that might be engendered by unregulated expressive activity in certain circumstances
 
 (see, International Socy. for Krishna Consciousness, v Lee,
 
 505 US 672, 677;
 
 Cornelius v NAACP Legal Defense & Educ. Fund,
 
 473 US 788, 799-800;
 
 United States Postal Serv. v Greenburgh Civic Assns.,
 
 453 US 114, 129). "Recognizing that the Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,’ ” the United States Supreme Court has accepted a "forum based” approach for assessing restrictions that the government may place upon the use of property
 
 (Cornelius v NAACP Legal Defense & Educ. Fund, supra,
 
 473 US, at 800 [quoting
 
 Greer v Spock,
 
 424 US 828, 836];
 
 see also, International Socy. for Krishna Consciousness, v Lee, supra,
 
 505 US, at 678). This principle should apply as well to quasi-public entities.
 

 Under the public forum doctrine, regulation of speech on government property that traditionally or by designation has been opened up for public expression and debate should be subjected to the sharpest scrutiny. Regulations of time, place and manner of expression may be permissible only when they are content-neutral and narrowly tailored to serve a significant government interest and allow for alternative modes and methods of communication
 
 (Perry Educ. Assn. v Perry Local Educators’ Assn.,
 
 460 US 37, 45). Indeed, a content-based prohibition might survive only when it is narrowly drawn to achieve a compelling governmental interest
 
 (see,
 
 id.;
 
 see also, International Socy. for Krishna Consciousness, v Lee, supra,
 
 505 US, at 677;
 
 Cornelius v NAACP Legal Defense & Educ. Fund,, supra,
 
 473 US, at 800). Importantly, everyone agrees that this case does not involve content-based regulations of any kind or quality.
 

 A corollary principle allows government, when it acts as proprietor, to reserve property for its intended primary purpose, as long as restrictive regulations on speech are reasonable and not an effort to suppress expression because of disagreement
 
 *699
 
 with the speaker’s view (see,
 
 Perry Educ. Assn. v Perry Local Educators’ Assn., supra,
 
 460 US, at 45 [citing
 
 United States Postal Serv. v Greenburgh Civic Assns.,
 
 453 US 114, 131,
 
 supra]; see also, International Socy. for Krishna Consciousness, v Lee, supra,
 
 505 US, at 678-679).
 

 Also of significance is the rubric that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse”
 
 (Cornelius v NAACP Legal Defense & Educ. Fund, supra,
 
 473 US, at 802). Absent evidence of a contrary intent, authorization of certain speech activities by the government — or a quasi-governmental entity like the Transit Authority — will not be deemed to transform an otherwise nonpublic forum into a wholly open public forum freed of any reasonable regulation regimens
 
 (id.,
 
 at 803). Thus, utilization of a nonpublic forum may be limited by speaker, subject matter and form of expression, so long as the restriction is viewpoint-neutral; to the extent a forum is designated to engender or foster some First Amendment activity, reasonable limitations on access are recognized to preserve and protect the retained nonpublic uses
 
 (see, id.,
 
 at 806;
 
 International Socy. for Krishna Consciousness v Lee, supra,
 
 505 US, at 682;
 
 United States v Kokinda,
 
 497 US 720, 730;
 
 see also, Widmar v Vincent,
 
 454 US 263;
 
 Madison School Dist. v Wisconsin Empl. Relations Commn.,
 
 429 US 167;
 
 Southeastern Promotions v Conrad,
 
 420 US 546;
 
 Loper v New York City Police Dept.,
 
 999 F2d 699, 703 [2d Cir];
 
 Young v New York City Tr. Auth.,
 
 903 F2d 146, 161-162 [2d Cir],
 
 cert denied
 
 498 US 984).
 

 While the United States Supreme Court’s adoption of the public forum doctrine has met with some critical commentary, as for example, allowing the government too much discretion in limiting the scope of designated public forums, it is the law
 
 (see, e.g., International Socy. for Krishna Consciousness v Lee,
 
 505 US 672, 695,
 
 supra
 
 [Kennedy, J., concurring];
 
 Cornelius v NAACP Legal Defense & Educ. Fund, supra,
 
 473 US, at 813-822 [Blackmun, J., dissenting]; Tribe, American Constitutional Law § 12-24, at 996 [2d ed 1988]; Post,
 
 Between Governance and Management: The History and Theory of the Public Forum,
 
 34 UCLA L Rev 1713, 1745 [1987]). Part of the redeeming value for the doctrine, however, is that the tolerated restrictions and nuanced distinctions must be reasonable in light of the purpose which the particular property and forum serve
 
 (Perry Educ. Assn. v Perry Local Educators’ Assn.,
 
 460 US 37, 47,
 
 supra
 
 [citing
 
 Greer v Spock,
 
 424 US 828, 838,
 
 supra]).
 
 Delicate as that
 
 *700
 
 doctrine may be in particular applications, it strives for a realistic and fair balance.
 

 IIL
 

 In considering the public forum analysis in the context of this case, everyone should prudently assay the distinctive character of the particular property and entity implicated here — a public, urban transportation system. In this regard, the United States Supreme Court’s reasoning in
 
 International Socy. for Krishna Consciousness v Lee
 
 (505 US 672, supra) emerges as particularly cogent and instructive. There, the Supreme Court pertinently held that an airport terminal operated by a public authority is a nonpublic forum. The Supreme Court noted that airport terminals historically have not been made available for assembly and debate, nor have they been opened to expressive activities by airport operators and managers
 
 (id.,
 
 at 680-681). It rejected a comparison to other transportation hubs, at which speech activities may have been tolerated, and noted that equating airports with other transportation centers would not take into account the extent to which such facilities can accommodate expressive activity
 
 (id.,
 
 at 681-682). Notwithstanding the myriad commercial enterprises and services that are provided in airport terminals, the Supreme Court observed that "[ajlthough many airports have expanded their function beyond merely contributing to efficient air travel, few have included among their purposes the designation of a forum for solicitation and distribution activities”
 
 (id.,
 
 at 683).
 

 The Supreme Court in
 
 Lee
 
 upheld as reasonable the Port Authority’s prohibition on solicitation. It added that solicitation disrupts the normal flow of traffic and delays passengers, often with troublesome and costly consequences
 
 (id.,
 
 at 683-684) . Ultimately, the Supreme Court observed that the Port Authority allowed solicitation outside the terminals and, therefore, assured reasonable access to travelers
 
 (id.,
 
 at 684-685) . To be sure, the multiple opinions in
 
 Lee
 
 ultimately converged to strike down a general prohibition against the distribution of literature. The portion of the regulation challenged by ISKON in that case encompassed a prohibition against leaf-letting and is, therefore, plainly distinguishable and inapt in assessing the narrow, particularized prohibition against commercial sales activity at issue here.
 

 The
 
 Transit Authority’s primary function in operating the New York City subway system and its associated properties is
 
 *701
 
 unquestionably to facilitate the safe and efficient transport of passengers in a responsible manner, just as the Port Authority, as implicated in
 
 Lee,
 
 seeks to do with its facilities. Thus, even applying the most stringent standards applicable to public forums, the Transit Authority has shown a compelling interest in providing the service and securing protection of the entire riding public and the surrounding communities. Correspondingly, it tries also to serve the needs and interests of competitors for limited space and interactive opportunities, not directly related to its essential function and service.
 

 Ultimately, we are persuaded by
 
 Lee
 
 that the Transit Authority’s subway stations are not public forums but, at best for appellant Rogers’ purposes, they would be limited public forums subject to reasonable regulation. These premises of our analysis are also consistent with analogous and instructive Federal case law
 
 (see, International Socy. for Krishna Consciousness v Lee,
 
 505 US 672,
 
 supra; see also, United States v Kokinda,
 
 497 US 720,
 
 supra; Young v New York City Tr. Auth.,
 
 903 F2d 146, 161-162 [2d Cir],
 
 supra; Loper v New York City Police Dept.,
 
 999 F2d 699, 703 [2d Cir],
 
 supra; see generally, Gannett Satellite Information Network v Metropolitan Transp. Auth.,
 
 745 F2d 767, 773 [2d Cir]).
 

 By enacting section 1050.6 (c) in conjunction with subdivision (b), the Transit Authority opened limited access to its subway stations to a variety of nontransit expressive activities, including "public speaking; distribution of written noncommercial materials; artistic performances, including the acceptance of donations; solicitation for religious or political causes; [and] solicitation for charities” (21 NYCRR 1050.6 [c]). While expressive activities of these kinds, therefore, cannot be deemed necessarily inconsistent with the essential nature and transportation uses of the properties
 
 (compare, Greer v Spock,
 
 424 US 828, 836,
 
 supra),
 
 the Transit Authority has expressly circumscribed the authorized forms of speech by retaining its prohibition against "commercial activity” (21 NYCRR 1050.6 [b]). We are satisfied that the Transit Authority possesses the legitimate authority to provide a public forum accommodation with some limited access and within a reasonable, content-neutral set of regulations.
 

 ¡V,
 

 Rogers urges this Court, in interpreting article I, § 8 of the State Constitution, to reject the public forum doctrine and its effect on this case. He proffers a more "contextual and fact-
 
 *702
 
 sensitive approach” under which a person engaged in expressive conduct would have a right of access to public property, subject only to narrowly tailored restrictions, so long as the manner of expression is not basically incompatible with the intended use of the property. He relies on language in
 
 Grayned v City of Rockford
 
 (408 US 104), a pre-public forum doctrine case, and
 
 People v Leonard
 
 (62 NY2d 404), a case in which this Court vacated a former student’s conviction for trespass on a SUNY campus. We stated in
 
 People v Leonard:
 

 "[W]hen the public enjoys broad license to utilize certain property, State trespass laws may not be enforced solely to exclude persons from exercising First Amendment or other protected conduct in a manner consistent with the use of the property. * * * Therefore, a decision to exclude that is predicated on or impermissibly inhibits a constitutionally or a statutorily protected activity will not be lawful”
 
 (id.,
 
 at 410-411 [citations omitted]).
 

 That is an entirely distinct context with no apt application here. Moreover, Rogers curiously adds in this regard that the Second Department, in
 
 SHAD Alliance v Smith Haven Mall
 
 (106 AD2d 189,
 
 revd
 
 66 NY2d 496), applied
 
 People v Leonard
 
 (62 NY2d 404,
 
 supra)
 
 in a manner that he claims supports his unpersuasive theory here. This Court’s rejection of the Appellate Division approach in
 
 SHAD Alliance,
 
 in effect, formidably undercuts the point of his argument and instead furnishes supplementary support for the result and rationale we adopt in the instant case.
 
 SHAD Alliance v Smith Haven Mall
 
 helps to sustain the proposition that New York Constitution, article I, § 8 does not provide the claimed separate right of access to privately owned places
 
 (see,
 
 66 NY2d 496,
 
 supra).
 
 By analogy and extension to the quasi-public Transit Authority premises here, Rogers’ novel approach in this regard is not supportable.
 

 V.
 

 We must now turn our attention to the next important aspect of this case — the conceded sales activity. The Transit Authority’s regulatory scheme limiting access to noncommercial expressive activity is both viewpoint-neutral and reasonable in light of the essential public transportation service purposes for which the properties exist
 
 (see, Cornelius v NAACP Legal Defense & Educ. Fund,
 
 473 US 788, 805,
 
 supra). The
 
 Transit Authority’s core justification for its prohibition against "commercial activity” is that, in its experience, the
 
 *703
 
 volume of "purveyors” who would be allowed the opportunity to secure proceeds from distribution of materials would be far greater than the volume of "solicitors” wishing merely to distribute products or literature without charge and with the hope for voluntary donations. Artwork, musical recordings, religious paraphernalia, buttons, T-shirts, flags and banners imprinted with a political or social message might automatically qualify under Rogers’ expansive theory of First Amendment protection for his sales of his organization’s newspaper and associated materials. Even assuming the proceeds of those sales are used to defray the cost of producing the goods or to otherwise fund a nonprofit organization, permitting sales would inescapably engender or encourage competitive participants and open an unmanageable overflow. The principle would be established and, thus, notions of de minimis quantity and incidental commercialism cannot be allowed. Any other more generous view might lead to a veritable bazaar of expressive merchandise being authorized to be churned for sales throughout the subway system. Instead of the secure and efficient flow of ridership traffic into and through the stations and the trains, a reasonably anticipated loss of control and unsafe interference with the concededly paramount purpose of this public transportation enterprise might ensue.
 

 Given the Transit Authority’s realistic and reasonable justification for its regulatory distinction between "solicitation” and "sales,” the sorting out as to whether the rule at issue is " 'the most reasonable’ ” or " 'the only reasonable’ ” limitation consistent with the property and forum should not shift to a judicial level of substituted judgment (see,
 
 United States v Kokinda,
 
 497 US 720, 730,
 
 supra
 
 [quoting
 
 Cornelius v NAACP Legal Defense & Educ. Fund,
 
 473 US 788, 808,
 
 supra]).
 
 In this respect, Rogers’ reliance upon
 
 Wright v Chief of Tr. Police
 
 (558 F2d 67) for a contrary result is plainly misplaced. In
 
 Wright,
 
 the Second Circuit Court of Appeals held that the Transit Authority’s prohibition against the exhibition or sale of newspapers in the New York City subway system could not stand absent a compelling government interest justifying a total bar. The court remanded for a trial to explore less restrictive alternatives.
 
 Wright,
 
 critically, was decided prior to the Supreme Court’s enlarged development of the public forum doctrine and, thus, cannot stand for the sweeping proposition that subway stations are somehow traditional public forums
 
 (contrast, International Socy. for Krishna Consciousness v Lee,
 
 505 US 672,
 
 supra).
 
 As we have shown, they are not. Neither
 
 *704
 
 does
 
 Wright
 
 support Rogers’ argument that the Transit Authority’s authorization of specified speech activities converts the subway system into a wholesale public forum. Moreover, the reasonableness of the Transit Authority’s ban on sales activity is further supported by the many alternative noncommercialized channels that remain open for Rogers’ expressive opportunities on behalf of his political activity and those of his organization (see,
 
 International Socy. for Krishna Consciousness v Lee, supra,
 
 505 US, at 684-685;
 
 Perry Educ. Assn. v Perry Local Educators’ Assn.,
 
 460 US 37, 53-54,
 
 supra; Greer v Spock,
 
 424 US 828, 849,
 
 supra).
 

 The Transit Authority’s application of section 1050.6 (b) and (c) to Rogers’ conceded sale is likewise unremarkable and unassailable. Section 1050.6 (b) expressly forbids unauthorized "commercial activity,” defined as:
 

 "(1) the advertising, display, sale, lease, offer for sale or lease, or distribution of food, goods, services or entertainment (including the free distribution of promotional goods or materials); and
 

 "(2) the solicitation of money or payment for food, goods, services or entertainment” (21 NYCRR 1050.6 [b]).
 

 The rule makes no exception to its flat prohibition against sales. Not-for-profit organizations and the like are not exempted in general or as to sales of their books or newspapers. Yet, appellant would have the courts draw such a line. That is an inappropriate role for the Judicial Branch in these circumstances and an unsupportable demarcation, in any event, on this record.
 

 Nor does the promulgated and applied rule exclude sales incidental to noncommercial expressive activities, as Rogers’ theory also tries to postulate in accordance with the trial court ruling in this case. Rogers relies on language in policy guidelines through which the Transit Authority first test-marketed nontransit uses, defining "commercial activities” in part as activities whose "main purpose” is the sale of goods or services. He thus maintains that his activities — minimal or incidental sales — are not intended to fall within the rule. Rogers’ multifaceted purpose in displaying the books and newspapers on a table set up at a subway station undeniably included the desire and the act of selling them. He does not dispute that, and the record supports the Transit Authority fact finding in that respect as well. Even accepting his argument that
 
 *705
 
 the "main purpose” behind his activity was not the sale of goods, the language in the experimental guidelines does not survive into the promulgated rules ultimately adopted by the Transit Authority and applied in this case.
 

 VL
 

 In sum, the Transit Authority’s action in this case involves a rational application of a constitutionally reasonable, sound and content-neutral regulatory blueprint, appropriate to its essentially nonpublic forum purpose (see,
 
 Matter of Salvati v Eimicke,
 
 72 NY2d 784, 791;
 
 Matter of Johnson v Joy,
 
 48 NY2d 689, 691;
 
 see also, Matter of Howard v Wyman,
 
 28 NY2d 434, 438). Here, the Transit Authority legitimately enacted a regulatory process that is purpose-related and premised on and accommodating to safety and access and general traveling public needs. That is, after all, its primary and essential
 
 raison d’etre.
 

 The determination that Rogers’ sales activity was plainly commercial falls properly within the regulatory scheme and the permissible ambit of Transit Authority responsibility. We reject his argument that such conduct acquires some automatic or general immunity from reasonable regulation in this unique environment — a nonpublic forum space — merely because the purveyor claims not-for-profit status or any other recognized protective umbrella, even as sweeping and important a cloak as the First Amendment. He, thus, properly falls within the rule and he violated it.
 

 The rule is also rational, limited and individually applied in this particular review setting and instance, based on an undeniably fair manner of implementation with specific notice, prior warning and fair hearing. A subway station is simply not a public forum under
 
 Lee (International Socy. for Krishna Consciousness v Lee,
 
 505 US 672,
 
 supra),
 
 and the rule should not be used as a boomerang to transform the Transit Authority’s realistically accommodating allowance into an "Open Sesame” for a stampede of likely competitors. Indeed, as the Second Circuit remarked in
 
 Young:
 
 "Confronted with the district court’s holding [enjoining enforcement of a prohibition against panhandling on the ground that Transit Authority regulations permit charitable solicitation], a cynic might remind the [Transit Authority] that 'no good deed goes unpunished’ ”
 
 (Young v New York City Tr. Auth.,
 
 903 F2d 146, 162,
 
 supra).
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 
 *706
 
 Chief Judge Kaye and Judges Titone, Smith, Levine, Ciparick and Wesley concur.
 

 Order affirmed, with costs.