OPINION OF THE COURT
Jacqueline W. Silbermann, J.
*846 Plaintiff moves for declaratory relief as well as a preliminary injunction enjoining the City of New York and its Department of Parks and Recreation from denying a permit to plaintiff for a rally in Central Park on the eve of the Republican National Convention in New York, to wit: Sunday,. August 29, 2004. Plaintiff asserts the denial violates article I, § 8 of the New York State Constitution. Defendants oppose the motion, arguing that the court should not countenance plaintiffs llth-hour attempt to renege on an agreement reached between the plaintiff and the City of New York on July 21, 2004 — more than one month ago — to hold the rally at an alternate location. Defendants further submit that in considering whether to issue an injunction, the equities weigh in favor of defendants.
For the reasons that follow, plaintiffs application for an injunction is denied. Defendants have established that plaintiffs request for a special events permit for a 215,000-person rally (with a stage, sound system and Jumbotron screens) on the Great Lawn, with spillover onto the East and North Meadows, on the eve of the Republican National Convention,* properly was denied. The Parks Department appropriately applied content-neutral regulations while leaving plaintiff with a reasonable alternate site suitable with ample means of communication. Moreover, by seeking to invoke this court’s equity jurisdiction mere days before the convention, plaintiff foreclosed an opportunity for the City to formulate an appropriate plan to ensure the safety of the public and to protect the City’s park land from what likely would be irreparable damage.
Background
In evaluating plaintiffs request for the extraordinary relief of an injunction on the virtual eve of the Republican National Convention, it is essential to consider the chronology of events relating to the proposed march and rally on Sunday, August 29, 2004:
June 4, 2003: Plaintiffs first application for a special events permit is submitted to the Parks Department. The application indicates plaintiffs wishes to hold a rally on the Great Lawn for *847 approximately 250,000 participants, on Sunday, August 29, 2004. The application does not provide for a rain date.
December 31, 2003: Plaintiff is notified by the Parks Department that decisions on applications for special event permits associated with the Republican National Convention “are being reserved until a date closer to the convention so that realistic decisions can be made concerning the number and nature of competing events.”
March 26, 2004: Representatives of the Police Department and United for Peace and Justice (hereinafter UPJ) meet to discuss possible routes for the march proposed by plaintiff. No agreement is reached, and representatives of UPJ and the Police Department do not meet again until May 26, 2004, two months later.
April 26, 2004: The Parks Department informs plaintiff that its special events permit application has been denied, due to the size of the proposed event and the likely severe damage to the lawns of Central Park.
May 6, 2004: Plaintiff files an administrative appeal to the denial of its application for an August 29th rally on the Great Lawn.
May 17, 2004: The Parks Department denies plaintiffs appeal on the ground that plaintiffs May 6, 2004 letter “did not present any additional information addressing the ground for the denial.”
May 26, 2004: UPJ and the Police Department meet for the second time. Again, no agreement is reached regarding plaintiffs proposal for a rally on the Great Lawn.
May 27, 2004: UPJ is informed by the Police Department of an alternate route for the march, as well as a rally on West Street, instead of in Central Park.
June 28, 2004: UPJ responds to the Police Department’s proposal and makes an alternative proposal which is rejected by the Police Department.
July 2, 2004: Representatives of the Police Department and UPJ hold another meeting. No agreement is reached with regard to the site for the march and rally.
July 9, 2004: Representatives of UPJ and the Police Department visit the proposed West Street site. .
July 14, 2004: New York Police Department coordinator for the Republican National Convention, Chief John McManus, writes to UPJ requesting a decision about the proposed West Street rally site by Friday, July 16th.
*848 July 16, 2004: Representatives of UPJ and the Police Department meet again. No resolution is reached with regard to the proposed West Street site.
July 21, 2004: UPJ agrees to a march no further north than 34th Street, followed by a rally on West Street.
August 3, 2004: Representatives of UPJ and the Police Department convene a meeting to discuss operational details of the march and rally.
August 10, 2004: UPJ informs the Police Department by letter that it will not proceed with the West Street rally, and submits a new application for a special events permit to the Parks Department seeking not only use of the Great Lawn, but the North Meadow and the East Meadow of Central Park, for a rally of approximately 215,000 people. Plaintiff proposes that 75,000 people be directed to the Great Lawn, 100,000 people be redirected to the North Meadow, and 40,000 be sent to the East Meadow.
August 16, 2004: Representatives of UPJ and the Police Department meet to continue negotiations regarding the march and rally sites.
August 17, 2004: Counsel for UPJ advise counsel for the City of New York of UPJ’s intention to file suit.
August 18, 2004: UPJ commences this action seeking a preliminary injunction directing defendants to grant plaintiff’s August 10, 2004 special events permit.
Argument
As an initial observation, many of the issues raised before this court have been raised and considered by the Honorable William Pauley III, District Judge of the United States District Court for the Southern District of New York, in a case entitled National Council of Arab Ams. v City of New York (331 F Supp 2d 258 [2004]). While Judge Pauley’s cogent decision denying injunctive relief is not controlling here, it is worth noting that the grounds for denial of the instant application are, if anything, stronger than those considered in the federal suit.
It is well-settled law that in order to prevail in its application for an injunction, plaintiff must clearly demonstrate (1) a likelihood of success on the merits; (2) irreparable injury, absent the grant of preliminary injunctive relief; and (3) a balancing of the equities in its favor. (See St. Paul Fire & Mar. Ins. Co. v York Claims Serv., 308 AD2d 347, 348-349 [1st Dept 2003]; Rosa *849 Hair Stylists v Jaber Food Corp., 218 AD2d 793, 794 [2d Dept 1995].) In balancing the equities, the court should consider various factors, including the interests of the general public, whether plaintiff was guilty of unreasonable delay, and whether plaintiff has unclean hands. (See Amarant v D'Antonio, 197 AD2d 432, 435 [1st Dept 1993] [unclean hands]; Currier v First Transcapital Corp., 190 AD2d 507, 508 [1st Dept 1993] [unclean hands]; Mercury Serv. Sys. v Schmidt, 50 AD2d 533, 533 [1st Dept 1975] [laches]; De Pina v Educational Testing Serv., 31 AD2d 744, 745 [2d Dept 1969] [interests of general public]; De Candido v Young Stars, Inc., 10 AD2d 922, 922 [1st Dept 1960] [laches], lv denied 11 AD2d 682 [1st Dept 1960]; Rodriguez v DeBuono, 175 F3d 227, 233 [2d Cir 1999] [interests of general public]; Southside Fair Hous. Comm, v City of New York, 928 F2d 1336, 1354 [2d Cir 1991] [laches].) Furthermore, since the purpose of a preliminary injunction is to maintain the status quo pending the litigation (see, e.g., Bonnieview Holdings, Inc. v Allinger, 263 AD2d 933, 935 [3d Dept 1999]), absent extraordinary circumstances, the injunction should be denied where (1) the status quo would be disturbed, and (2) plaintiff would receive the ultimate relief sought by the lawsuit (see St. Paul Fire & Mar. Ins. Co., 308 AD2d at 349; Rosa Hair Stylists, 218 AD2d at 794).
In the case at bar, not only does plaintiffs motion seek the ultimate relief sought by the lawsuit and a change of status quo, but plaintiff cannot clearly demonstrate a constitutional violation or a balancing of the equities in its favor.
Although plaintiff comes to court seeking equity, the above chronology establishes that plaintiff does not come to court with “clean hands,” because plaintiff is guilty of inexcusable and inequitable delay. Plaintiff was on notice of the denial of its application for a permit to rally in Central Park when it received the Parks Department’s final determination on the administrative appeal on May 17, 2004 — a full three months ago. Indeed, it is this court’s opinion that if plaintiff had filed the instant application in a timely fashion, operational plans could have been implemented to accommodate plaintiff’s desire for a rally in Central Park, with adequate protection for the public and preserving the integrity of the park lands.
At this juncture, however, plaintiff simply cannot be heard to bring a constitutional challenge to a march-and-rally plan it publicly and voluntarily agreed to on July 21, 2004 — more than one month ago. Indeed, even after plaintiff reneged on that *850 agreement on August 10, 2004, it waited an additional week to bring suit, unnecessarily prejudicing defendants.
The case of Irish Lesbian & Gay Org. v Giuliani (918 F Supp 732, 735-736 [SD NY 1996]) is instructive in the case at bar. There, plaintiff challenged the denial of its application to march on the day of the Hibernian’s St. Patrick’s Day Parade, claiming that New York City violated its First Amendment rights. Only 19 days before the parade, plaintiff moved for a preliminary injunction compelling the issuance of a permit. (Id. at 749.) The District Court denied the motion, holding that plaintiff was “guilty of laches for failing to bring the lawsuit earlier when the position of the parties could be thoroughly presented.” (Id. at 748.)
Here, plaintiffs delay in coming to court, and its decision to renege on its July 21st commitment, demonstrate that it lacks the clean hands that are a prerequisite for the grant of equitable relief — regardless of any alleged or even actual wrong attributable to defendants. As the United States Supreme Court stated:
“The guiding doctrine in this case is the equitable maxim that ‘he who comes into equity must come with clean hands.’ This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith.” (Precision Instrument Mfg. Co. v Automotive Maintenance Mach. Co., 324 US 806, 814 [1945], reh denied 325 US 893 [1945]; accord Amarant, 197 AD2d at 434.)
Defendants do not dispute that plaintiff has a right under the State Constitution to engage in political speech. (See NY Const, art I, § 8.) However, that privilege does “not guarantee the right to communicate one’s views at all times and places or in any manner that may be desired.” (Heffron v International Socy. for Krishna Consciousness, Inc., 452 US 640, 647 [1981]; accord Rogers v New York City Tr. Auth., 89 NY2d 692, 698, 702 [1997] [“(N)othing in the Constitution commands that dissemination of all forms of speech at all times on all kinds of property are absolutely protected under the First Amendment, without regard for the nature of the activity, the property or the disrup *851 tion that might be engendered by unregulated expressive activity in certain circumstances”]; Housing Works, Inc. v Kerik, 283 F3d 471, 478 [2d Cir 2002] [“It is well settled that the First Amendment protects the free use of such a public place for rallies . . . (However, the) protection afforded for such use is not absolute . . . because expressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used” (internal quotation marks omitted)].) Accordingly, speech may be regulated by reasonable time, place, and manner restrictions. (See, e.g., Rogers, 89 NY2d at 702; Heffron, 452 US at 647; Housing Works, Inc., 283 F3d at 478.)
Under both the State and Federal Constitutions, the analysis applicable to a regulation which restricts speech in a public forum is the same: A regulation is constitutional where (1) it is content-neutral; (2) it is narrowly tailored to meet a significant governmental interest; and (3) it leaves open ample alternative means of communication. (See Rogers, 89 NY2d at 698 [applying federal public forum analysis to New York State Constitution]; United for Peace & Justice v City of New York, 323 F3d 175, 176 [2d Cir 2003]; People for Ethical Treatment of Animals v Giuliani, 105 F Supp 2d 294, 336 [SD NY 2000] [“New York state courts apply a forum analysis, along with the concomitant standards, similar to the doctrine formulated by the Supreme Court to govern First Amendment cases”].)
The principal inquiry in determining content neutrality is whether the government adopted a regulation because it disagrees with a message conveyed. (Ward v Rock Against Racism, 491 US 781, 791 [1989], reh denied 492 US 937 [1989]; Housing Works, Inc., 283 F3d at 480.) “The government’s purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.” (Ward, 491 US at 791; accord Housing Works, Inc., 283 F3d at 480.)
The Parks Department is authorized to establish rules “for the use, government and protection of public parks.” (New York City Charter § 533 [a] [9].) Accordingly, the Parks Department promulgated regulations concerning, inter alia, hours of park operations (see 56 RCNY 1-03 [a]); use of metal detectors (see 56 RCNY 1-04 [b] [5]); littering (see 56 RCNY 1-04 [c]); restriction on glass bottles (see 56 RCNY 1-04 [d]); controlled substances (see 56 RCNY 1-04 [h]); care of animals (see 56 RCNY *852 1-04 [g]); public urination (see 56 RCNY 1-04 [k]); and permit applications for special events (see 56 RCNY 2-08). The rules further require all groups of more than 20 persons to apply for a permit, including groups organized for concerts, exhibits, barbecues, picnics, athletic events, social gatherings, religious services, and political speeches. (See 56 RCNY 1-02, 2-08.) The Parks Department may deny a permit where:
“(1) the location sought is not suitable because of landscaping, planting, or other environmental conditions reasonably likely to be harmed by the proposed event;
“(2) the location sought is not suitable because it is a specialized area including, but not limited to, a zoo, swimming pool, or skating rink, or because the proposed event is of such nature or duration that it cannot reasonably be accommodated in that location;
“(3) the date and time requested have previously been allotted by permit;
“(4) within the preceding two years, the applicant has been granted a permit and did, on that prior occasion, knowingly violate a material term or condition of the permit, or any law, ordinance, statute or regulation relating to the use of the parks; or
“(5) the event would interfere unreasonably with the enjoyment of the park by other users.” (56 RCNY 2-08 [c].)
These criteria provide clear, concise and objective standards for determining whether a special events permit should be granted. Clearly, the permitting regulations were promulgated to ensure orderly usage of parks, and were not intended to restrict a message associated with any particular event.
Content-neutral permitting schemes for the use of public parks and streets have been routinely upheld as constitutional methods of regulating competing uses of public fora. (See, e.g., Thomas v Chicago Park Dist., 534 US 316 [2002]; Cox v New Hampshire, 312 US 569, 576 [1941]; Utah Animal Rights Coalition v Salt Lake City Corp., 371 F3d 1248, 1258 [10th Cir 2004] [“Permitting schemes are necessary to ensure that scarce space is allocated among conflicting applicants, to protect public access to thoroughfares and public facilities, and to enable police, fire, and other public safety officials to function”].) In Thomas, a municipal park ordinance required individuals to obtain a permit before conducting large-scale events. (534 US at 318.) *853 Petitioners applied for permits to hold rallies advocating the legalization of marijuana. (Id. at 319-320.) When some of those applications were denied, petitioners challenged the ordinance as unconstitutional. (Id. at 320.) The Supreme Court rejected that challenge, stating:
“[T]he licensing scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum. The Park District’s ordinance does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say. Indeed, the ordinance (unlike the classic censorship scheme) is not even directed to communicative activity as such, but rather to all activity conducted in a public park. The picnicker and soccer player, no less than the political activist or parade marshal, must apply for a permit if the 50-person limit is to be exceeded. And the object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District’s rules, and to assure financial accountability for damage caused by the event. As the Court of Appeals well put it: ‘[T]o allow unregulated access to all comers could easily reduce rather than enlarge the park’s utility as a forum for speech.’ ” (Id. at 322; see also Ward, 491 US at 794 [rejecting facial challenge to a rule which regulated sound amplification in Central Park].)
There is no credible evidence in the case at bar that the denial of plaintiffs permit application for a rally in Central Park was based on the content or viewpoint of UPJ’s message. Rather, the evidence established that the Department’s determination was based on entirely content-neutral factors, to wit: that the Great Lawn was not an appropriate venue for a demonstration of this magnitude.
Furthermore, it is beyond peradventure that the City of New York is not required to grant a permit precisely as requested, nor is it compelled to provide exactly the desired demonstration location. (See, e.g., Concerned Jewish Youth v McGuire, 621 F2d *854 471, 474 [2d Cir 1980] [holding that it was proper to confine protestors to a bullpen across the street from the Russian Mission, and to prevent them from protesting in groups larger than 12], cert denied 450 US 913 [1981]; Gay Veterans Assn., Inc. v American Legion-N.Y. County Org., 621 F Supp 1510, 1517 [SD NY 1985] [upholding denial of permit application for a 3x/2-mile parade route, through the City’s financial areas, where the parade would have caused significant traffic disruption]; Irish Lesbian & Gay Org. v Bratton, 882 F Supp 315, 320 [SD NY 1995] [holding that plaintiff had no First Amendment right to its desired parade route in seeking to carry its message to other parade participants].)
Here, it is clear that the denial of plaintiffs application to rally in Central Park does not unnecessarily burden plaintiffs right to free speech. Indeed, had plaintiff honored the agreement it reached with the Police Department on July 21, 2004, for a rally on West Street following its march up to and along West 34th Street, it would have been in a position to work with the Police Department to put in place, in the following weeks, the operational details for an orderly and successful event, along with the opportunity (now squandered by plaintiffs delay) to publicize the event and draw participants with assurances of a well-planned and organized program. In short, to the extent plaintiff claims that the West Street site will be inadequate for its purposes, the shortcomings will largely have been of its own making, as the West Street site is certainly adequate to hold the numbers of people plaintiff anticipates attending the rally, and, with adequate advance preparation (including seeking out private sources of funding), plaintiffs could likely have obtained the money necessary to supply Jumbotrons and other electronic means of disseminating the speech taking place on stage. Certainly, the problems plaintiff suggests with the line of sight along West Street are no greater than those presented by plaintiffs proposed event on three Central Park sites, two of which are separated from the Great Lawn by approximately one mile (and the Central Park Reservoir).
The right to free speech does not guarantee plaintiff “the best channels or locations for [its] expression.” (Carew-Reid v Metropolitan Transp. Auth., 903 F2d 914, 919 [2d Cir 1990].) “Whether ample alternatives are available does not depend on the preference of the speaker” for the forum of his choice. (Irish Lesbian & Gay Org. v Giuliani, 918 F Supp at 744.) Nor does free speech entitle plaintiff to maximize its audience, partici *855 pants, or media coverage. (See Irish Lesbian & Gay Org. v Giuliani, 918 F Supp at 744.)
As there is no single park site in New York City that could hold the 215,000 or more participants expected for the UPJ rally, the choices among three park sites (contained within Central Park) and a single site along West Street cannot reasonably be viewed as choices which the State Constitution would distinguish as constitutional or unconstitutional.
Conclusion
For the foregoing reasons, plaintiffs application for declaratory relief and an injunction is denied, and the underlying action is hereby dismissed.

 Plaintiff submitted two separate special events permits for Central Park. The first, dated June 4, 2003, sought a permit for a 250,000-person rally on the Great Lawn. The second, dated August 10, 2004, seeks a permit for a 215,000-person rally on the Great Lawn, with spillover onto the North and East Meadows in the Park (although practically there is no way to predict accurately the number of participants in an event such as the one proposed by plaintiff).