HOUSING WORKS, INC., Plaintiff,

v.

Howard SAFIR, Commissioner of the New York City Police Department; the City of New York, and Rudolph Giuliani, Mayor of the City of New York, Defendants.

No. 98 Civ. 4994(HB).

United States District Court, S.D. New York.

April 6, 2000.

Christopher Dunn, Norman Siegel & Arthur Eisenberg, New York Civil Liberties Union Foundation, New York City, for plaintiff.

Michael D. Hess by Daniel S. Connolly & Hillary Weisman, New York City, for defendants.

### OPINION & ORDER

BAER, District Judge.

Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thought between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.).

Plaintiff Housing Works, Inc. ("Housing Works") brings this action to permanently enjoin the defendants from enforcing a rule of the City of New York that limits to 50 the size of groups conducting expressive activity on the steps of City Hall or to 150 the size of groups assembling on the adjacent plaza. This lawsuit is another in a long line of First Amendment cases involving the City which Judge Calabresi recently characterized as "a relentless onslaught of First Amendment litigation." *See Tunick v. Safir,* 209 F.3d 67, (2d Cir.2000).

This Court has twice previously granted the plaintiff a preliminary injunction against similar policies of the New York City Police Department. *See Housing Works, Inc. v. Safir, et. al.,* 1998 WL 823614 (S.D.N.Y. Nov.25, 1998) [hereinafter *Housing Works II* ], *stay granted in part,* 1998 WL 824534 (2d Cir., Nov.30, 1998) (order issuing partial stay later withdrawn); 1998 WL 409701 (S.D.N.Y. July 21, 1998) [hereinafter *Housing Works I* ]. For the reasons set forth below, this Court now grants plaintiff's request for a permanent injunction.

### I.  Background

#### A.  The Parties

Plaintiff is a not-for-profit organization that provides housing and services and advocates on behalf of persons with AIDS and HIV in New York City. The organization has repeatedly protested the policies of Mayor Rudolph Giuliani and his administration concerning what it has provided (or not provided) in the way of services to persons afflicted with AIDS.

On June 16, 1999, the City promulgated rules which codified the City's policy which limited to 50 the number of persons permitted to engage in expressive conduct on the steps of City Hall. After further amendment, public review, and comment, the rules were made final on January 19, 2000. *See* 55 RCNY, Ch. 9 (2000) (hereinafter "Final Rules").

#### B.  Facts

The following uncontested facts are taken from the submissions of the parties.

On July 14, 1998, plaintiff initiated the instant litigation, seeking a preliminary injunction against the defendants. At that point, the City had limited press conferences on the steps of City Hall to 25 participants. This Court, in *Housing Works I,* issued a preliminary injunction permitting the plaintiffs to hold a press conference involving not more than fifty people on the steps of City Hall. As of September 23, 1998, the New York City Police Department ("NYPD") concluded that no events of any type, without exception, could take place on the steps of City Hall. *(See* deposition testimony of Deputy

Inspector Pedro Pineiro, November 16, 1998).

The very next month to the day, the City administration hosted some 5000 invited guests to a celebration commemorating the World Series victory of the New York Yankees. The ceremony, authorized and attended by the Mayor and Commissioner Safir (the "Commissioner") took place on the steps and plaza of City Hall.

Some two weeks later, on November 6, 1998, the defendants denied the plaintiff's request for a December 1 event commemorating World AIDS Day planned for the steps of City Hall. Thereafter, on November 10, 1998, the City adopted a new policy with respect to assembly in the vicinity of City Hall. This policy, approved by the Commissioner, provided that public gatherings "will not be permitted within certain protective zones" and that government officials, private persons, and the like would be directed "to such alternative locations, to the extent feasible as will permit the event to occur within proximity of the protective zones." Under this policy, allegedly adopted for security purposes, the Commissioner could authorize the use of City Hall steps and plaza for ceremonial occasions that were, *inter alia*, (1) of extraordinary public interest; (2) unique to city hall; (3) unique, non-annual events of civic and city-wide import (e.g. inaugurations, visits by world leaders, sports achievements, etc.); and (4) require a ticket for entry.

The City hosted a large ceremony on the steps of City Hall for John Glenn and other space shuttle astronauts on November 16, 1998. Some 3,000 tickets were distributed in advance of the event, and access to the area in front of City Hall was allowed in the same manner as the previous Yankees event.

On December 1, 1998, the plaintiff held a press conference and a rally commemorating World AIDS Day in the immediate vicinity of City Hall, pursuant to the order of this Court and the order of the Second Circuit. *See Housing Works II, Housing Works, Inc. v. Safir,* 1998 WL 824534, No. 98–9559 (2d Cir., Nov. 30, 1998) (emergency stay denied but injunction modified). The event, a press conference, was held in the plaza [1] in front of City Hall, at a distance from the steps of City Hall. The area was blocked off with metal barricades that created three separate "pens," one for speakers (approximately 50 people), and one for participants (approximately 200 people) and a third for the press. On that same day, the plaintiff held a separate 24–hour vigil to mark World AIDS day at the south end of City Hall Park at which the number of participants was not restricted. (*See* Transcript of Aug. 27, 1999 Hearing, cross-examination of Charles King).

A group of approximately 15 City Council members held a press conference on the steps of City Hall on December 7, 1998. The press conference was allowed despite the fact that no determination had been made by the NYPD as to whether the event satisfied the November 10, 1998 restrictions. Thereafter, on December 12, 1999, representatives of the union representing school principals asked permission to hold a rally on February 11, 1999 on the steps and in the plaza. The record reflects that the NYPD denied this request.

A group of approximately 8 City Council members, 13 members of the public, and several City Council staffers held a press conference on the steps of City Hall, in violation of the November 10, 1998 policy restrictions on December 20, 1998. On the same day, the City itself hosted a press conference in violation of the November 10, 1998 policy restrictions. The conference was held on the plaza in front of City Hall, at which the Mayor presented a new yellow cab to a cabbie whose taxicab was destroyed when a Lower East Side parking garage collapsed. Metal barricades were absent.

---

1. At that time, the area was also used for parking official city vehicles.

Approximately 17 City Council members held a press conference on the steps of City Hall on February 10, 1999, again in violation of the November 10, 1998 policy restrictions. Thereafter, on February 23, 1999, the November 10, 1998 policy was amended. The amendments provided that all persons entering the City Hall area were subject to metal detectors and other searches; no more than 50 persons were permitted "in an area of the City Hall plaza to be designated by the Municipal Security Section"; and a group of no more than 50 person could hold a press conference, rally, or demonstration on the steps of City Hall, but only if a City Council member had invited the group to hold its event on the steps and was present at the event. Any group wishing to hold such an event without a sponsoring City Council member's invitation and presence was required to hold the event in the portion of the plaza furthest away from City Hall.

There were some notable additional exclusions in the February 1999 amendments to the November 1998 policy. The new restrictions, including the 50 person limit, did not apply to "public ceremonies and commemorations, inaugurations, award ceremonies, celebrations, festivals and similar events which have traditionally been organized or sponsored by the City of New York and administered by the Department of Citywide Administrative Services and/or the Department of Parks and Recreation."

On March 10, 1999 a group called "Movement for Change" held a press conference on the steps of City Hall with 45 members of the public, and two City Council members. Many others from the press and public stood on the plaza abutting the steps. This press conference was held in apparent violation of the February 23, 1999 amended policy.

The plaintiff held a press conference and rally at City Hall in a portion of the plaza furthest from the steps of City Hall on March 23; 1999. The defendants utilized metal barriers to confine the participants.

By letter dated April 6, 1999, and following a conference with the Court, the City suspended for 90 days the requirement that events take place on the steps only with a City Council member present as a sponsor. Also, additional conditions were imposed on all events on the steps during the 90–day period: (1) prior notice must be given to NYPD; (2) the press conference/demonstration could last for no longer than an hour; (3) no more than 50 people could be present at the event; (4) each group was permitted to have only one event per day; and (5) no more than 2 press conferences/demonstrations were permitted per day.

On June 16, 1999, the defendants informed this Court that they had promulgated new rules, (in part it is assumed as a consequence of the renovation that had recently been completed in front of City Hall and in the Park) governing events on and near the steps of City Hall similar to the draft rules from February 1999. Notably, the rules included a 50 person limit "on the City Hall steps and sidewalk fronting City Hall." Again, the City excluded "public ceremonies and commemorations, inaugurations, award ceremonies, celebrations, festivals, and similar events which have traditionally been organized or sponsored by the City of New York and administered by the Department of Citywide Administrative Services and/or the Department of Parks and Recreation."

On August 27, 1999 and again on October 5, 1999, this Court heard testimony from plaintiff and defense witnesses on the rationale, scope, and merits of the defendants' policy regarding access to the steps of City Hall. The City issued its rules in final form on January 19, 2000. The Final Rules require that persons or groups seeking to hold a press conference or engage in expressive conduct on the steps, sidewalk and plaza area fronting City Hall must apply for a permit with the NYPD. Such activity, if permitted, must conclude within two hours; and no more than 50 people may engage in First Amendment activity

on the steps of City Hall; otherwise, 150 people may participate in such activity on the plaza adjacent to the south steps of City Hall.

## II. Discussion

■ The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the moving party must show actual success on the merits. *See, e.g., University of Texas v. Camenisch,* 451 U.S. 390, 392, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). This Circuit has noted that, as courts of equity, courts "may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved." *Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115, 1121 (2d Cir.1975), cert. denied, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976).

■ This Court has previously observed that "[p]laintiff's right to protest the City's lack of services for persons afflicted with AIDS and HIV is a fundamental right grounded in the First Amendment, as the parties agree." See *Housing Works I,* 1998 WL 409701 at *2. Yet, the First Amendment does not guarantee an absolute right to speak, assemble or protest. *See Olivieri v. Ward,* 801 F.2d 602, 605 (2d Cir.1986) *cert. denied,* 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987). The government may impose reasonable restrictions as to the time, place, and manner of the plaintiff's activity if such regulations are necessary to further significant governmental interests. *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). However, the "government has no power to restrict such activity because of its message." *Id.* (footnote omitted). The well-established tests for assessing the validity of governmental restrictions on speech require that the regulations (1) be content-neutral, (2) be narrowly tailored to meet a significant governmental interest, and (3) leave open ample alternative means of communication. *Clark v. Community for Creative Non-*

*Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

In *Lehman v. City of Shaker Heights,* Justice Blackman elaborated on the balancing process which is required in these situations: "Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question". 418 U.S. 298, 302–303, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (citations omitted).

The steps and plaza of City Hall are by their very nature, quintessential public forums. "These forums include those places which by long tradition or by government fiat have been devoted to assembly and debate, such as parks, streets, and sidewalks." *See Burson v. Freeman,* 504 U.S. 191, 196, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (citations omitted). "Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.). Such expressive activity, however, even in a quintessential public forum, may interfere with other important activities for which the property is used. *See Burson v. Freeman,* 504 U.S. 191, 197, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). *See also Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) ("[I]n places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed.").

## A. The City's Jan. 19, 2000 Rules are Content-based and Grant City Officials Excessive Discretion

■ It is a fundamental tenet of First Amendment principles that restrictions on

the right to free speech or assembly must not be so vague as to afford unbridled discretion to the government authority seeking to abridge those rights. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The Supreme Court has observed that "[a] government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of supporting a particular point of view.'" *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130–31, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (quoting *Heffron v. International Society for Krishna Consciousness Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)). Consequently, reasonable time, place, and manner restrictions on public speech "must contain 'narrow, objective, and definite standards to guide'" the appropriate authority. *Forsyth*, 505 U.S. at 130, 112 S.Ct. 2395 (quoting *Shuttlesworth* at 150–51, 89 S.Ct. 935 (1969)). Absent such a scheme, "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great." *Id.* (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)).

■ Section 9.02 of the Final Rules refers obliquely to events that "have traditionally been organized or sponsored by the City of New York" and notes that "[a] monthly list of scheduled public events will be available through a designated officer of the Police Department." Clearly, some governmental functions and activities are undoubtedly events which the City must organize. Mayoral inaugurations and ceremonies honoring civil servants qualify as public events. However, there is nothing in the record that indicates how the City will decide which events may be scheduled as "public events." The Rules set forth no clear principles that will guide City officials as they decide whether or not the City should sponsor an event.

Section 9.02 of the City's Final Rules explicitly states that "[c]overed activities shall not include public ceremonies and commemorations, inaugurations, awards ceremonies, celebrations, festivals and similar events which have traditionally been organized or sponsored by the City of New York and administered by the Department of Citywide Administrative Services and/or the Department of Parks and Recreation." By contrast, "covered activities" include press conferences and expressive activities including demonstrations and vigils and are subject to limitations on the number of speakers. Plaintiff suggests that the defendants' regulations provide limits only on disfavored speakers, while allowing any city-sponsored event to take place without regard to numerical limits. The City claims that § 9.02 allows much larger events to take place on the steps or the plaza only to the extent that such activities may be classified as governmental activities, that are categorically and readily distinguishable from "covered activities." Such government-sponsored activities have in the past included the commemorations of World Series victories by the New York Yankees and a celebration in honor of astronauts returned from space travel. The City has also organized a number of other governmental events at City Hall including ceremonies to honor police or fire personnel who have distinguished themselves in the line of duty. The defendants further point out that even the Mayor and city councilmembers must apply under the Final Rules for a permit if they wish to hold a press conference on the steps of City Hall. Thus, the City argues, the Final Rules do not discriminate based upon the viewpoint or the content of the speech of the permit-seeker. Finally, on February 16, 2000, the defendants submitted a letter to this Court, in effect stipulating that no longer would the City sponsor a host of cultural events which defendants had traditionally sponsored in the vicinity of City Hall. *See* Letter from Daniel S. Connolly, Special Counsel, to Honorable Harold Baer, Jr. (February 16, 2000); Pre-

trial Order, Exhibit B. The letter represents that in the future, the City will require that any private organization wishing to conduct events outside City Hall "will be permitted to do so provided they make the appropriate application and abide by the applicable provisions of the rules." The City had traditionally sponsored a variety of events in the immediate vicinity of City Hall, such as the Young Republicans rally and the Daily News Stickball Tournament.

Despite this eleventh hour reversal of unofficial policy, this Court finds that the Final Rules are facially content-based. Nothing in the standards established by the defendants prevents the City from permitting a wide variety of groups access to the steps and plaza of City Hall under § 9.02 of the Final Rules while requiring those who wish to exercise their First Amendment rights to abide by strict limitations on the duration of expressive conduct and the number of participants. The Supreme Court has held that "[o]nce a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say." *Police Department of City Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

This Court observes that very little in the Final Rules restricts the City's ability to designate an event as falling under the § 9.02 exemptions. The Final Rules circumscribe press conferences and expressive conduct while there are a host of activities that could be classified as an event "... which ha[s] traditionally been organized or sponsored by the City of New York." Put another way, the Final Rules permit the City to exclude virtually any activity which the City chooses to sponsor. For example, should the defendants decide that they wish to hold an event commemorating World Aids Day, the City may presumably invite activists and city residents to attend, and such an event might proceed with several thousand participants. In re-

ality however, the City has decided that only certain events deserve commemoration, and thus any World Aids Day event would presumably be limited to 50 people on the steps of City Hall or 150 people on the plaza. It is hard for this Court to imagine that a celebration of the Yankee's victory is inherently a governmental activity and worthy of City Hall sponsorship while the commemoration of World Aids Day is relegated to an event with no more than fifty or one hundred and fifty participants.

This Court is unpersuaded by the defendants' argument that if the plaintiff prevails, the City would be required to allow unprecedented access to any private party seeking to hold a large-scale event at City Hall. This is not so. Nothing in this Court's equitable power could require the defendants to facilitate massive, City Hall-closing events for private parties. It is not the opinion of this Court that the defendants' past practice of commemorating World Series victories somehow entitles the plaintiff and every other private organization to hold an event in the vicinity of City Hall that shuts down City Hall for the day, creates security risks and brings thousands of spectators and hundreds of police officers to the scene. Rather, this Court observes that the Final Rules, as written, allow the City to practice content-based or viewpoint-based discrimination in deciding which ideas it will celebrate and which it may marginalize, circumscribe, and restrict. The Final Rules fail to set forth principled guidelines that the City must adhere to when presented with a request by a group seeking to hold an arguably non-covered activity, such as a festival or a similar cultural celebration in the immediate vicinity of City Hall. Presumably, if such an activity has in the past been sponsored by the City, it qualifies as an event that has been "traditionally ... sponsored by the City of New York" and will be scheduled as a public event by the City. The Final Rules do not prevent the City from at any time adding additional

events to the schedule of activities that may take place on the steps of and in the plaza in front of City Hall under City sponsorship. The vice here is that the choice to sponsor or not sponsor non-covered activity is at the sole, subjective discretion of the defendants. The Final Rules, as drafted, allow City officials to arbitrarily decide the types of activities that the City will sponsor. It is this unfettered discretion that this Court finds unconstitutional. *See Forsyth County*, 505 U.S. at 130–31, 112 S.Ct. 2395 (1992) (a government regulation that allows arbitrary application is unconstitutional as it "has the potential for becoming a means of supporting a particular point of view"); *Miami Herald Pub. Co. v. City of Hallandale*, 734 F.2d 666, 675 (11th Cir.1984) (accompanying considerable government discretion "is the opportunity to discriminate against a licensee on the basis of what the licensee intends to say . . . .").

Despite the City's assurances of even-handedness, which this Court does not discount, I am troubled by the fact that if a private organization has political connections to City officials, or is considered worthy of attention by the City, the City has the authority to hold a very large event honoring that organization, whereas an unpopular group (or a group unpopular at City Hall) must go through an application process and may be limited to assembling 50 people in a two hour period on the steps of City Hall. Thus, this Court finds that there are two standards governing the right to assemble on the steps and plaza of City Hall, one for demonstrators, and another for City-sponsored speech. The restrictions, therefore, violate the plaintiff's First Amendment rights.

**B. The Numerical Limits Imposed by the City's Final Rules are not Narrowly–Tailored**

The defendants in this case bear the burden of demonstrating that a time, place, and manner restriction on protected speech is narrowly tailored to serve a sig-

nificant governmental interest. *See Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1052 (2d Cir.1983). In determining whether the defendants have met this burden, this Court "must independently determine the rationality of the government interest implicated and whether the restrictions imposed are narrowly drawn to further that interest." *Olivieri*, 801 F.2d 602, 606 (2d Cir.1986). Both parties acknowledge that the City's interest in protecting the safety and convenience of participants seeking to hold a public forum and the protection of public officials and visitors entering and leaving City Hall is a significant governmental objective. *See Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Thus, the crucial question is whether this policy is narrowly tailored to serve these significant government interests.

As I noted in *Housing Works I*, "courts in this Circuit have consistently held that numerical limits on First Amendment activity are not narrowly tailored when it has been shown that the government has sanctioned activity beyond the numerical limits prescribed in the policy." 1998 WL 409701 at *3 (citing *Bery v. City of New York*, 97 F.3d 689, 697–98 (2d Cir.1996) (limit of 853 vending licences not narrowly tailored to interest in avoiding street congestion where City made exception to rule and granted additional licenses); *Rock Against Racism v. Ward*, 658 F.Supp. 1346, 1358 (S.D.N.Y.1987) (limit of 3000 people in Central Park area not narrowly tailored because City previously permitted at least 4000 people to attend other events in the same location), aff'd. in part, rev'd in part, on other grounds, 848 F.2d 367 (2d Cir.1988), rev'd on other grounds, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *United Yellow Cab Drivers Ass'n, Inc. v. Safir*, 1998 WL 274295, at *3 (S.D.N.Y. May 27, 1998) (numerical limitation of 25 taxicabs in demonstration not narrowly tailored to the safety interest in

regulating traffic congestion where City allowed at least four other processions of larger numbers of taxicabs in the past)). The City's recent sponsorship of a celebration for the Yankees after their 1999 World Series victory in October illustrates that the defendants' Rules are made to apply only to those events which the City has chosen not to sponsor. The defendants' prior practice of allowing more than 50 people to participate in press conferences, without incident, undermines their factual claim that the 50 person limit is narrowly tailored to address safety and security concerns.

It is undisputed that between January 1, 1995 and July 1998, the defendants have permitted numerous press conferences and other events on the plaza in front of City Hall in which 50 or more people participated. *See* Pretrial Order at 1. At most of these events, the City closed the front steps of City Hall and the doors to which those steps lead. In *Housing Works I*, this Court noted that the steps of City Hall take up an area measuring 81 feet, 1–1/2 inches by 23 feet, 1–1/2 inches, and rise to an elevation of 6 feet, 6 inches. *See* 1998 WL 409701, *1. A site visit to the steps of City Hall, with counsel for both parties present, allowed this Court to assess firsthand the renovation at and around City Hall and the space constraints at issue. The evidence does not support defendants' contention that more than 50 people cannot assemble on the steps of City Hall without impeding access to the building or compromising safety. The parties have stipulated that the City has the right to require that visitors to City Hall pass through magnetometer and submit to searches of their person and property. In sum, this Court finds that the Final Rules are not narrowly tailored to a significant government interest.

### III. Conclusion

For the reasons set forth above, this Court finds as a matter of law that Chapter 9, Title 55 of the Rules of the City of New York is unconstitutional because it is content-based, affords undue discretion to City officials, and is not narrowly tailored.

It is therefore hereby ORDERED that the plaintiffs' request for a permanent injunction is GRANTED. The defendants are permanently enjoined from enforcing any provision of Chapter 9, Title 55 of the Rules of the City of New York.

**SO ORDERED.**