HOUSING WORKS, INC., PLAINTIFF-APPELLEE,
v.
BERNARD KERIK, COMMISSIONER OF THE NEW YORK CITY POLICE DEPARTMENT AND THE CITY OF NEW YORK, DEFENDANTS-APPELLANTS.

Docket No. 01-7245
August Term, 2000

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Argued: June 25, 2001
March 7, 2002
HOUSING WORKS, INC., PLAINTIFF-APPELLEE,
v.
BERNARD KERIK, COMMISSIONER OF THE NEW YORK CITY POLICE DEPARTMENT AND THE CITY OF NEW YORK, DEFENDANTS-APPELLANTS.
 Docket No. 01-7245
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: June 25, 2001
March 7, 2002
 
 1
 Appeal from a judgment of the United States District Court for the Southern District of New York (Wood, J.), permanently enjoining the enforcement of a policy prohibiting the use of amplified sound in the plaza of New York City Hall, the district court having determined that the policy vests impermissible discretion in city officials and therefore violates the First Amendment.
 
 
 2
 Reversed.
 
 
 3
 Judge Leval concurs in a separate opinion.
 
 
 4
 Christopher T. Dunn, New York Civil Liberties Union, New York, NY (Arthur Eisenberg, of counsel), for Plaintiff-Appellee.
 
 
 5
 Ellen S. Ravitch, Corporation Counsel's Office, City of New York, New York, NY (Daniel S. Connolly, Steven J. McGrath, on the brief), for Defendants-Appellants.
 
 
 6
 Before: Miner and Leval, Circuit Judges, and Scullin, Chief District Judge.[1]
 
 Miner, Circuit Judge
 
 7
 Defendants-appellants Bernard Kerik, Commissioner of the New York City Police Department and the City of New York (together, "the City") appeal from a judgment entered in the United States District Court for the Southern District of New York (Wood, J.), in favor of plaintiff-appellee Housing Works, Inc. ("Housing Works"). The judgment permanently enjoins the City from enforcing its policy banning the use of amplified sound on the steps, sidewalks, and plaza area directly in front of New York City Hall. The district court determined that the sound amplification policy involves the impermissible exercise of discretion by the City and therefore is facially violative of the First Amendment. For the reasons that follow, we reverse.
 
 BACKGROUND
 
 8
 Housing Works is a not-for-profit corporation that provides housing, services, and advocacy for New York City residents who have AIDS or are HIV positive. It frequently organizes outdoor events, rallies, and demonstrations to call public attention to its goals. The action giving rise to this appeal originated in the City's denial of a formal request by Housing Works to use amplified sound in the plaza adjacent to City Hall at its World AIDS Day event on December 1, 2000. The request was made in a letter dated September 27, 2000, from Christopher Dunn, Esq. of the New York Civil Liberties Union, to Daniel S. Connolly, Esq. of the New York City Law Department. Mr. Dunn advised that the sound would be used only in a manner that could reasonably be regulated by the City and that the sound level would not in any way disturb the business of City Hall. The letter included the opinion that any ban on the use of sound would have the effect of undermining the permanent injunction against the City issued in a prior action involving the same parties. See Housing Works, Inc. v. Safir, 101 F. Supp. 2d 163 (S.D.N.Y. 2000). Apparently, materials were submitted in the prior action tending to show that a ban on sound would have the effect of limiting demonstrations and rallies to no more than fifty people in the plaza, a numerical limitation impermissible under the injunction issued in Safir.
 
 
 9
 In his letter of reply dated October 10, 2000, Mr. Connolly stated that Housing Works' previous requests for use of the steps and plaza area of City Hall and for permission to conduct a twenty-four-hour vigil in and around City Hall Park in connection with the December 1, 2000 event would be granted upon timely application. He also noted that Housing Works would be granted a sound amplification permit for thirteen consecutive hours for the City Hall Park portion of the event. As to sound amplification in City Hall Plaza, Mr. Connolly observed that sound amplification has not traditionally been permitted in that area, except for certain exempted events when City Hall is closed for business. The proximity of the plaza to the seat of City government and the consequent interference with public business caused by amplified sound was the reason given for denial of the permit.
 
 
 10
 Responding to Mr. Dunn's assertion that the ban on sound amplification would undermine the injunction issued in Safir, Mr. Connolly stated that, although the issue of sound may have been discussed, it was not before the court and not resolved by the injunction that was issued in that case. Mr. Connolly reminded Mr. Dunn that a limited experiment had been conducted using sound amplification in the plaza for a single event. According to Mr. Connolly, the experiment demonstrated that only a minimal amount of amplified sound could be used without disruption to the City Hall building. The low decibel levels allowed were said to be so frustrating to the organizers of the event in achieving their purposes that there were repeated violations of the agreed-upon levels.
 
 
 11
 In Safir, a permanent injunction was issued against enforcement of the Rules then contained in Chapter 9, Title 55 of the New York City Rules and Regulations. See id. at 171. These Rules limited the size of groups engaging in expressive activity on the steps of City Hall to fifty persons and the size of such groups assembling on the plaza adjacent to City Hall to 150 persons. Events were limited to two hours in duration. Issued on January 19, 2000, the Rules exempted from coverage events traditionally organized or sponsored by the City and administered by designated City agencies. A permit, issued on application to the New York City Police Department, was required for the conduct of any covered activity.
 
 
 12
 In invalidating the Rules in their entirety, the district court found that Chapter 9, Title 55 "is unconstitutional because it is content-based, affords undue discretion to City officials, and is not narrowly tailored." Id. The court opined that the Rules "permit the City to exclude virtually any activity which the City chooses to sponsor." Id. at 169. Since "very little in the... Rules restrict[ed] the City's ability to designate an event as falling under the... exemptions," id., the district court concluded that the Rules vested undue discretion in City officials. The district court accordingly determined that the Rules "allow the City to practice content-based or viewpoint-based discrimination in deciding which ideas it will celebrate and which it may marginalize, circumscribe, and restrict." Id. With respect to the numerical limits imposed by the Rules, the district court found that "[t]he evidence does not support defendants' contention that more than 50 people cannot assemble on the steps of City Hall without impeding access to the building or compromising safety," id. at 171, and therefore concluded that the "Rules are not narrowly tailored to a significant government interest," id.
 
 
 13
 Responding to the permanent injunction issued by the district court in Safir, the City promulgated a new set of rules. On April 19, 2000, the City adopted Chapter 10 of Title 55 of the New York City Rules and Regulations, effective May 19, 2000. Chapter 10, entitled "Rules for Press Conferences, Demonstrations and Similar Activities in the Immediate Vicinity of City Hall" applies to covered activities in the plaza area of City Hall. The plaza area is described as "the bluestone-paved area bordered on the north by the sidewalk fronting City Hall, on the south by City Hall Park and to the east and west by cobblestone parking areas." 55 R.C.N.Y. § 10-01. "Covered activities" are defined as "press conferences, demonstrations, picketing, speechmaking, vigils and like forms of expressive conduct." Id. Specifically excluded from the definition of covered activities are "(i) inaugurations; (ii) award ceremonies for city employees; and (iii) ceremonies held in conjunction with a City-sponsored ticker-tape parade." Id. § 10-02.
 
 
 14
 The new Rules also limit to 300 the number of persons permitted to gather and limit to three the number of hours allowed for covered activities on the steps, sidewalks, and plaza fronting City Hall as designated by the Police Department, id. § 10-03; provide that groups of over 300 persons and those who seek to engage in a covered activity for longer than three hours be directed to obtain a permit for the use of City Hall Park or comparable area, id.; prohibit the obstruction of the usual use of City Hall and conduct that is disorderly or dangerous to public safety, id. § 10-05; establish procedures to be administered by the Police Department for applications for permits to engage in covered activities as well as criteria for the granting or denial of permits, id. § 10-06; allow for the revocation of permits by the Police Department during the conduct of covered activities for specified reasons, id. § 10-07; authorize police to use magnetometers or other security devices to preserve public peace and safety, id. § 10-08; and confer authority upon the police to "order the closure of or limit access to the City Hall area in the event of an emergency or period of heightened security," id. § 10-09.
 
 
 15
 Although sound amplification is not mentioned in Chapter 10, the City's sound amplification policy is to prohibit the use of amplified sound in City Hall Plaza except for the three types of events that the Rules exempt from the definition of covered activities: inaugurations, award ceremonies for city employees, and ceremonies held in conjunction with City-sponsored ticker-tape parades. The City's historical practice during the past 116 years has been to hold ticker-tape parades only for the purpose of honoring heroes (as exemplified by aviators and astronauts), athletes, soldiers, and visiting dignitaries and statesmen. On such occasions, City Hall is closed and no business is conducted by either the legislative or executive branches of City government.
 
 
 16
 General provisions for the regulation of sound devices and apparatus are found in the New York City Administrative Code. According to these provisions, an application for the use of sound amplification equipment in, on, or near or adjacent to any public street, park, or place must be made to the police commissioner at the precinct covering the area where the equipment is to be used. N.Y.C. Code § 10-108(e). The terms of the permit to be issued in response to the application are set forth in the Code. Id. § 10-108(f). The regulatory scheme includes a variety of "[s]pecial restrictions" that require the commissioner to deny permits for the use of a sound device or apparatus including where "physical conditions are such that the use of a sound device or apparatus will deprive the public of the right to the safe, comfortable, convenient and peaceful enjoyment of any... place for... public purposes." Id. § 10-108(g)(3). Fees, penalties for violations, and exceptions for religious use are among the remaining provisions. Id. § 10-108(h)-(j).
 
 
 17
 Housing Works commenced the action giving rise to this appeal following the notification that amplified sound would not be permitted in the plaza of City Hall for its annual World AIDS Day event to be held on December 1, 2000. It promptly moved for a preliminary injunction to allow it to use sound amplification at the event in accordance with its written request. Housing Works argued that the sound amplification ban was invalid because the City's policy provided standardless discretion to government officials in regard to expressive activity at City Hall Plaza; was content-based and therefore constituted an unreasonable time, manner, and place restriction; was not narrowly tailored to achieve any legitimate government interest; and did not leave open ample alternative means for the communication of its message.
 
 
 18
 Various affidavits, exhibits, and stipulations were submitted by the parties in connection with the preliminary injunction motion, and Housing Works adduced testimony from Charles King, Co-Executive Director of Housing Works, and William Magod, Vice-President of a company that designs and rents sound amplification systems. One set of stipulations submitted to the court, dated November 9, 2000, included the following:
 
 
 19
 1. On October 30, 2000, in conjunction with the City sponsored ticker-tape parade rally in honor of the New York Yankees, the City of New York issued a permit which allowed amplified sound to be used in the plaza of City Hall. (A copy of that permit and the application is attached as Exhibit A). Such amplified sound was well in excess of 75dB(A) at ten feet.
 
 
 20
 2. For the purposes of the pending preliminary injunction proceedings only, it is stipulated that written guidelines or rules do not exist governing the process by which the City of New York decides to sponsor ticker-tape parades.
 
 
 21
 3. For the purposes of the pending preliminary injunction proceedings only, it is stipulated that the City does not rely upon a representation that the sound amplification ban in dispute is justified by concerns relating to the size of the NYPD detail at City Hall. There is a police presence in and around City Hall at all times.
 
 
 22
 4. For the purposes of the pending preliminary injunction proceedings only, it is stipulated that during the course of the past ten years, there have been events held within the City of New York where amplification equipment was shut off by local enforcement officials over the objection of either the event organizers or others present at the event, and that such action by local enforcement officials resulted in some members of the audience becoming unruly, hostile and in some cases, violent.
 
 
 23
 5. For the purposes of the pending preliminary injunction proceedings only, it is stipulated that at events where sound amplification equipment is shut off by local enforcement during the course of the event and over the objection of event organizers or others present at the event, there exists a likelihood that the participants to the event will have a negative reaction. Such negative reaction might include hostile, unruly or violent conduct by some participants.
 
 
 24
 6. Sound amplified in the plaza of City Hall at 81dB(A) or below -- measured at six feet from the speaker -- cannot be heard inside City Hall.
 
 
 25
 Following oral argument, the court granted Housing Works' motion for a preliminary injunction in an unpublished order dated November 26, 2000. The district court first found adequate authority for the sound amplification ban in City Hall Plaza in the fact that the new Rules governing demonstrations in the plaza did not provide for sound amplification. The court also found such authority in the power conferred upon the police to maintain public peace and safety in the plaza and in the City Charter restrictions on sound amplification. However, the court concluded "that the City policy violates the First Amendment requirement that regulation of speech be content-neutral, because the exceptions that the City is permitted to make vest too much discretion in City officials." In view of this determination, the court saw no need to examine claims that the policy is content-based because it discriminates among subjects of speech, that it fails to meet the requirement of narrow tailoring to serve a significant government interest, and that it leaves open ample alternatives of communication. The district court noted that it was prepared to rule on these claims if necessary, because a full factual record had been developed.
 
 
 26
 In concluding that the City policy vests excessive discretion in City officials, the district court examined well-established practices in regard to ticker-tape parades, since sound amplification is permitted in conjunction with these events. The court found that the ticker-tape parades during the past 116 years had consistently been restricted to four categories of honored recipients: heroes, as exemplified by aviators and astronauts; athletes; soldiers; and visiting dignitaries and statesmen. Even as to these limited categories, according to the district court, the City's policy regarding sound amplification in the plaza does not provide the narrow, objective, and definite standards required to determine eligibility. The district court concluded that, since the City has discretion in choosing who fits within the various categories, it is thereby enabled to support or suppress a particular point of view. To illustrate this point, the district court noted that Nelson Mandela was honored by a ticker-tape parade but, as conceded by the City, more controversial foreign dignitaries who did not enjoy the same base of support as Mr. Mandela would be unlikely to receive the City's honors. Accordingly, the district court concluded "that the City has incorporated impermissible discretion into the sound amplification decision, through the mechanism of relying on its ticker-tape parade sponsorship discretion."
 
 
 27
 On February 26, 2001, after holding a conference and considering submissions of the parties, the district court issued a permanent injunction. See Housing Works, Inc. v. Kerik, 00 Civ. 7830, 2001 U.S. Dist. LEXIS 1991 (Feb. 26, 2001). In its order and judgment, the district court noted that it had "limited its analysis to the narrow issue of discretion," and determined "that no further discovery is warranted and that this matter should proceed to final judgment." Id. The court concluded "for the reasons set forth in its November 26, 2000 [preliminary injunction] Order, that the City policy violates the First Amendment as a matter of law." Id. Accordingly, the court ordered that "the City of New York is permanently enjoined from enforcing its sound amplification policy in City Hall Plaza." Id. at *2.
 
 DISCUSSION
 I. Authority for City Policy
 
 28
 At the outset, we note our agreement with the district court's determination that the City had the authority to implement a policy banning sound amplification in City Hall Plaza. Characterizing the issue of authority as a "threshold question," Housing Works challenges this determination on appeal as it did in the district court. In its brief, Housing Works argues that the "policy is without lawful basis and is nothing more than a pronouncement of the Office of the Corporation Counsel." We reject this argument and find an adequate legal basis for the sound amplification policy.
 
 
 29
 First, the new comprehensive rules promulgated to govern demonstrations and similar forms of expressive conduct in City Hall Plaza, 55 R.C.N.Y. § 10-01-10, make no provision for the use of sound amplification equipment. The City interprets this omission in a complete regulatory scheme as authority for the sound amplification ban in the plaza area. We defer to the City's construction of a regulation it is charged with administering. Edwards' Lessee v. Darby, 25 U.S. (12 Wheat.) 206, 210 (1827) (stating that construction by those appointed to carry out provisions of law is "entitled to very great respect"). Second, authority for the City's policy can be found in 55 R.C.N.Y. § 10-08, which states that "[n]othing in these provisions shall restrict the power and authority of the Police Department to preserve the public peace and safety in the vicinity of City Hall."
 
 
 30
 Finally, section 10-108 of the New York City Administrative Code, which deals generally with the issuance of permits and the administration of regulations respecting the use of sound devices, prohibits the police commissioner from issuing a permit whenever he determines that physical conditions are such that the use of the device would "deprive the public of the right to the safe, comfortable, convenient and peaceful enjoyment of any... public... place." N.Y.C. Code § 10-108(g)(3). The Corporation Counsel, as representative of the City, communicated the City's policy to Housing Works in the October 10, 2000 letter from Mr. Connolly. The policy in this case, therefore, did not originate in a pronouncement by the Corporation Counsel as did the policy at issue in City of New York v. American Sch. Publ'ns, Inc., 69 N.Y.2d 576 (1987), but instead finds its basis in established provisions of the New York City Administrative Code and Rules.
 
 II. First Amendment Analysis
 A. Of Impermissible Discretion
 
 31
 The City does not dispute that City Hall Plaza is a public forum as defined by the Supreme Court: a "place[] which by long tradition or by government fiat ha[s] been devoted to assembly and debate." Burson v. Freeman, 504 U.S. 191, 196 (1992) (internal quotation marks omitted). It is well settled that the First Amendment protects the free use of such a public place for rallies of the sort conducted by Housing Works.
 
 
 32
 The protection afforded for such use is not absolute, however, because "expressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used." Id. at 197. Therefore,
 
 
 33
 even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).
 
 
 34
 Government-imposed restrictions on time, place, or manner of speech in a public forum will fail the neutrality requirement if they confer overly broad discretion on the regulating officials. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992). Without proper standards to apply, there exists a potential that official discretion will be exercised to suppress a particular point of view. Id. Accordingly, regulations governing speech in a public forum "must contain `narrow, objective, and definite standards to guide the licensing authority.'" Id. at 131 (quoting Shuttlesworth v. Birmingham, 394 U.S. 147, 150-51 (1969)).
 
 
 35
 The regulation at issue in Forsyth County provided for payment in advance of a fee of not more than $1,000 per day for a permit to conduct a parade, procession, or open-air meeting. Id. at 126. It empowered a Forsyth County government official to set the fee in an amount deemed necessary to meet administrative expenses as well as expenses relating to the maintenance of public order. Id. at 127. The Supreme Court analyzed Forsyth County's interpretation and implementation of its regulation and noted that there were no objective factors provided for the guidance of the administrator charged with issuing the permits in regard to the fees to be charged. Id. at 133. The Court concluded that in order to assess the cost of maintaining public order, it was necessary for the administrator to examine the content of the message, an examination prohibited by the First Amendment. The Court put it this way: "The costs to which [Forsyth County] refers are those associated with the public's reaction to the speech. Listeners' reaction to speech is not a content-neutral basis for regulation." Id. at 134.
 
 
 36
 In Shuttlesworth, the municipal ordinance provided for the granting of a permit for a parade, procession, or public demonstration "unless in [the City Commission's] judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." 394 U.S. at 149-50. The Court determined that the ordinance conferred "virtually unbridled and absolute power" upon the City Commission and concluded that the ordinance as it was written, therefore, fell squarely within the ambit of the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional. Id. at 150-51.
 
 
 37
 The ability of the City Commission members to apply their own concepts to such matters as convenience, morals, good order, decency, health, safety, peace, and public welfare presented an irremediable defect in the ordinance.
 
 
 38
 The policy of the City regarding amplified sound in City Hall Plaza does not confer unfettered or unbridled discretion upon City officials. The policy simply provides that amplified sound may not be used in the City Hall Plaza except for those limited and celebratory occasions when City Hall is closed. The reason for the policy is clear: the noise level of amplified sound so close to the City Hall building is a distraction to the executive and legislative officials who work inside the building as well as to the members of the public who have business to transact there. The control of noise level is a legitimate public concern. See Kovacs v. Cooper, 336 U.S. 77, 86-87 (1949). Legitimate government functions must be carried out without excessive noise interference, and even the regulations governing the use of sound permits in places other than City Hall Plaza prohibit the issuance of a permit when physical conditions are such that the public would be deprived of the peaceful use of a public facility such as City Hall. See N.Y.C. Code § 10-108(g)(3).
 
 
 39
 The very limited discretion afforded to City officials in conducting a public ceremony during which City Hall is closed and sound amplification permitted cannot in any way be said to be comparable to the content-based restrictions found objectionable in the cases examined by the Supreme Court. The district court thought that the ticker-tape parade exemption to the sound amplification ban did not provide the definite, narrow, and objective standards necessary to dispel impermissible discretion. In fact, ticker-tape parades, which traditionally wind up at City Hall Plaza, have occurred only twelve times in the past twenty years. City officials have not exercised their discretion beyond the limits announced by the City policy, and have designated ticker-tape parades only for the limited purpose of honoring heroes, athletes, soldiers, visiting dignitaries, and statesmen. These affairs do not involve content-based messages of any sort. They are instead dedicated to the celebration of the kind of accomplishment and achievement recognized by all. City officials have very limited discretion in regard to the designation of these events, and to say that they have undue discretion is a gross exaggeration.
 
 
 40
 The Supreme Court teaches that "[t]he principal inquiry in determining content neutrality... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Rock Against Racism, 491 U.S. at 791. Underlying the City policy at issue here is a purpose to bar generally the use of amplified sound so as to avoid interruption of essential government functions. Accordingly, it constitutes "[a] regulation that serves purposes unrelated to the content of expression" and therefore "is deemed neutral even if it has an incidental effect on some speakers or messages but not others." Id.
 
 
 41
 To the extent that the City policy confers discretionary authority upon City officials to select those commonly understood to be deserving of honor for their accomplishments and therefore entitled to ticker-tape parades that entail the closing of City Hall, the policy has, at best, an incidental effect on those, like Housing Works, who desire to advance specific viewpoint-based speech. Accordingly, we are of the opinion that the City's policy banning amplified sound in City Hall Plaza, except for the very occasional celebratory ticker-tape parades when City Hall is closed, provides on its face a sufficiently narrow, objective, and definite standard to pass constitutional muster in regard to the requirement of content neutrality. Cf. MacDonald v. Safir, 206 F.3d 183, 193 (2d Cir. 2000) (remanding for consideration of actual practices where language of ordinance vests overbroad discretion in Police Commissioner).
 
 B. Of Narrow Tailoring
 
 42
 Agreeable to the district court's determination that the record is sufficiently complete to rule on the narrow tailoring and ample alternatives of communication requirements, we proceed to deal with those issues without remanding for further proceedings in the district court.
 
 
 43
 In a case involving an unsuccessful challenge to a New York City regulation requiring the use of city sound equipment and an independent sound technician for performances in a bandshell in Central Park, the Supreme Court "reaffirm[ed]... that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." Rock Against Racism, 491 U.S. 798. Rather, the requirement of narrow tailoring is satisfied so long as the... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Id. at 799 (internal quotation marks and citations omitted).
 
 
 44
 The ban on sound amplification in City Hall Plaza advances the City's "substantial interest in protecting its citizens from unwelcome noise." City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 806 (1984). The City policy therefore serves a legitimate, content-neutral government interest. But does it focus, as required, on the source of the evils to be eliminated without restricting significantly a substantial quantity of speech not involving the same evils? See Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 917 (2d Cir. 1990). Although the policy at issue may not achieve its goals by the very least restrictive means possible, we think the answer is yes.
 
 
 45
 While it is true that the sound amplification system in City Hall Plaza can be adjusted to a degree that the sound cannot penetrate the City Hall building, there are problems associated with such an adjustment of sound volume. First, there is a need to monitor the equipment to insure that the proper decibel level is maintained. Second, there is the problem, recognized by both parties in the stipulation dated November 9, 2000, of potential unruly, violent, and hostile conduct when the sound levels are set too low for many of those present to hear. "[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." Hill v. Colorado, 530 U.S. 703, 726 (2000).
 
 
 46
 Bearing in mind the goal of the City's policy, the banning of all amplified sound in City Hall Plaza, except for the very rare occasion of a ticker-tape parade, while not the least restrictive or least intrusive means of regulating noise in the plaza, does satisfy the narrow tailoring requirement. To say otherwise is to substitute the opinion of the Court for that of "the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." United States v. Albertini, 472 U.S. 675, 689 (1985). Such a substitution of opinion is not the business of the courts. Finally, in finding compliance with the narrow tailoring requirement, we take note of the very limited construction that City officials have given to the interpretation of City policy in respect of the holding of ticker-tape parades. See Village of Hoffman Estates v. Flip-side, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982). As to alternative means of communication, it is apparent that such means are not foreclosed to Housing Works.
 
 C. Of Alternative Channels of Communication
 
 47
 The requirement for alternative channels of communication is easily fulfilled in this case. In addition to the many other public areas in New York City where amplified sound is permitted, there is City Hall Park, adjacent to and south of the plaza. Housing Works itself has held events with sound amplification in the park but seeks the higher profile of sound-amplified activities in the plaza. That Housing Works considers no other City location as beneficial for its purposes as City Hall Plaza does not negate the fact that significant alternate channels are open for the messages it wishes to convey.
 
 
 48
 The City policy restrictions at issue "impose only a minimal inhibition on the ability of [Housing Works] to communicate its ideas" in light of the many alternative channels available. Concerned Jewish Youth v. McGuire, 621 F.2d 471, 476 (2d Cir. 1980). In Concerned Jewish Youth, a group was prohibited from conducting demonstrations in front of the Russian Mission to the United Nations. However, twelve persons were allowed to demonstrate in a "bull pen" diagonally across the street from the Mission. Id. at 472. Overflow areas were permitted in an avenue and in a street nearby. In holding that adequate channels of communication were provided, we said: "We do not think that the First Amendment guarantees news publicity for speakers, nor does it guarantee the continued fervor of one's fellow demonstrators." Id. at 474.
 
 
 49
 Even the desire of Housing Works for a high-profile location for its public activities is easily satisfied here. Housing Works has never been prohibited from conveying its message in City Hall Plaza. Only the level of noise it might use there is restricted through the ban on amplification equipment. Moreover, it is difficult to imagine a more desirable alternative site for an amplification-aided event than City Hall Park, which is situated right next to City Hall Plaza. We hold that the City's ban on sound amplification in the plaza leaves open very adequate alternative channels for communication of the information Housing Works seeks to disseminate. See Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).
 
 CONCLUSION
 
 50
 For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded to the district court for entry of judgment for the defendants.
 
 NOTE:
 
 
 [1]
 The Honorable Frederick J. Scullin, Jr., Chief Judge of the United States District Court for the Northern District of New York, sitting by designation.