POOLER, Circuit Judge,
concurring.
I believe that Costello’s as-applied challenge presents a closer question than my colleagues are willing to acknowledge. Accordingly, I respectfully concur in the judgment, and join in Part III of the Chief Judge’s opinion, but write separately because I believe this case is better resolved on qualified immunity grounds rather than on the merits.
I.
In concluding that Burlington’s noise ordinance is plainly constitutional as applied to Costello, my colleagues gloss over the facts of the cases on which they rely— namely, that most of their legal authority relates to mechanically amplified noise. See Op. at 45 (citing Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (amplified noise at rock concerts in New York’s Central Park)); Op. at 45-46 (citing Housing Works, Inc. v. Kerik, 283 F.3d 471 (2d Cir.2002) (amplified sound on steps, sidewalks and plaza in front of New York City Hall)). On this ground alone, their two principle authorities, Ward and Kerik, are factually distinguishable from the case sub judice; however, it also bears mention that Ward and Kerik both involved noise regulations designed in part to ensure the physical safety of residents, see Ward, 491 U.S. at 785, 109 S.Ct. 2746; Kerik, 283 F.3d at 481. Accord Carew-Reid v. Metro. Transp. Auth., *50 903 F.2d 914, 917 (2d Cir.1990) (“In this case, the interest in eradicating excessive noise is bolstered by the serious public safety concerns posed by the noise to both the riders and employees of the subway system.”). By contrast, the City of Burlington has not suggested that noise threatens the physical safety of any individual on the mall.
Further, Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), is identified by my colleagues as the point of origin for the proposition that the “Government has a substantial interest in protecting its citizens from unwelcome noise.” Op. at 45 (internal quotation marks, citation and alterations omitted). That case, however, did not involve noise but rather an ordinance prohibiting the posting of signs on public property. See Taxpayers for Vincent, 466 U.S. at 791-92, 104 S.Ct. 2118. To the extent Taxpayers for Vincent discussed noise, it did so only in describing the Supreme Court’s holding in Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). See Taxpayers for Vincent, 466 U.S. at 805-06, 104 S.Ct. 2118 (“In Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), the Court rejected the notion that a city is powerless to protect its citizens from unwanted exposure to certain methods of expression ... In upholding an ordinance that prohibited loud and raucous sound trucks, the Court held that the State had a substantial interest in protecting its citizens from unwelcome noise.”). It is Kovacs that gives me pause about the constitutionality of Burlington’s ordinance as applied to Costello.
In Kovacs, the Supreme Court upheld a facial challenge to an ordinance that banned amplified sound trucks from using city streets to relay their message. The Court noted that these trucks, with their “loud and raucous” noise were “dangerous to traffic at all hours” and upset the “quiet and tranquility” of residential neighborhoods. 336 U.S. at 87, 69 S.Ct. 448. Central to the Court’s holding in Kovacs was the notion that individuals in their homes were not free to walk away from the noise, see id. at 89, 69 S.Ct. 448 (“We think that the need for reasonable protection in the homes or business houses from the distracting noises of vehicles equipped with such sound amplifying devices justifies the ordinance.”). In concluding that the ordinance was constitutional, the plurality opinion in Kovacs stressed the difference between sound trucks and street corner speeches or pamphleting, recognizing that the streets are the “normal place for the exchange of ideas by speech or paper.” Id. at 86-87, 69 S.Ct. 448. Further, Justice Frankfurter in his concurrence noted “vital differences between natural speech, even of the loudest spellbinders, and the noise of sound trucks.” Id. at 96, 69 S.Ct. 448 (emphasis added).
My colleagues believe that Burlington’s ordinance is constitutional as applied to Costello because “Costello’s noise impinged on the use of the neighborhood by ... residents in adjacent apartments who may wish quiet to work or think or listen to media; shop-owners who need customers; diners who wish to converse, do business, or court.” Op. at 46. All of these may be true, but no support for any of these conclusions is found in the record before us.
The Chief Judge’s opinion concludes that the absence of record facts is insignificant. To the contrary, the Chief Judge insists that requiring such evidence — i.e., a finding that there were apartments within earshot of Costello, or that there was any diner outside who could hear Costello, or that Costello’s preaching interfered with any customer’s shopping — means that “be *51 fore issuing a warning, the unfortunate officer ... would have to poll restaurant patrons, shop-owners, customers, and residents of adjacent apartments to see if the screaming disrupts their ‘quiet and tranquility.’ ” Op. at 47. This position misapprehends the foundation of the constitutional standard and mischaracterizes my concern about this ease. The constitutional standard requires the government generally — not every summons-issuing police officer — show that the speech restriction is narrowly tailored to serve a significant government interest. See Deegan, 444 F.3d at 142. My concern with this case does not relate to what the officer did or did not do, but rather, consonant with the constitutional standard, to the City of Burlington’s failure to put into the record any evidence that residents were disturbed, diners were unable to converse or shop-owners had difficulty soliciting customers. The evidence does not even tell us whether there was a single apartment within earshot of Costello.
Street preaching, while undoubtedly bothersome to some, has a long history in this country; it strikes me of at least some import that religious groups seeking protection from persecution for their religious activities by state governments were among the principal supporters of the Bill of Rights. See Douglas Laycock, Religious Liberty as Liberty, 7 J. Contemp. Legal Issues 313, 345-46 (1996). In this case, the burden was on the government to establish that Burlington’s speech restriction is justified as narrowly tailored to serve a significant governmental interest. See Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir.2006). Without more of a record than we have before us, to conclude that the ordinance is plainly constitutional strikes me as too much of a thumb on the scale, especially where, as here, we need not reach the constitutional question to resolve the case.
II.
A.
Qualified immunity shields government officials from civil suits for damages “insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
To rule on the issue of qualified immunity, courts generally proceed in two steps. First, courts usually address the threshold question of whether the complaint alleges the deprivation of an actual constitutional right. Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The Supreme Court has explained that “[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.” Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). However, “if a violation could be made out on a favorable view of the parties’ submissions,” courts then proceed to step two, which involves an inquiry as to “whether the right was clearly established” at the time of the act grieved. Id. Whether a right was clearly established at the relevant time is a question of law, whereas the question of whether an official’s conduct was objectively reasonable is a mixed question of law and fact. Kerman v. City of New York, 374 F.3d 93, 108-09 (2d Cir.2004).
Saucier’s two-step framework, while often helpful, is not mandatory; the Supreme Court has recognized that a court may, in its own discretion, refrain from determining whether a constitutional right has been violated and instead move direct *52 ly to the question of qualified immunity (i.e., whether a constitutional right was clearly established at the time the defendant acted). See Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (“[W]hile the sequence of events set forth [in Saucier v. Katz ] is often appropriate, it should no longer be regarded as mandatory.”). Such an exercise of discretion is particularly appropriate where, as here, a case presents “difficult constitutional questions” and “there is available an easier basis for the decision (e.g., qualified immunity) that will satisfactorily resolve the case before the court.” Id. at 817-18, 129 S.Ct. 808 (quoting Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)). Because there is no question that Costello’s right to preach as loudly as he could on Church Street was not clearly established at the time Sergeant Lewis asked him to lower his voice, we need not grapple with the First Amendment question in order to reach a satisfactory conclusion in this case. Accord Higazy v. Templeton, 505 F.3d 161, 179 n. 19 (2d Cir.2007) (“We do not reach the issue of whether Higazy’s Sixth Amendment rights were violated, because principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case.”).
B.
In determining whether a particular right was clearly established at the time a defendant acts, this Court considers three things: (1) whether the right in question was defined with “reasonable specificity”; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir.1991). Under this rubric, the dispositive question is whether it was “objectively reasonable,” at the time of the challenged action, for the government official to have believed his actions were lawful. Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); see also Robison v. Via, 821 F.2d 913, 920-21 (2d Cir.1987).
We have previously rejected a facial challenge to Burlington’s noise ordinance, holding that the ordinance is not impermissibly vague. See Howard Opera House Assocs. v. Urban Outfitters, Inc., 322 F.3d 125, 125 (2d Cir.2003). We have also indicated that similarly-worded ordinances “do not necessarily raise constitutional concern.” Deegan v. City of Ithaca, 444 F.3d 135, 140 (2d Cir.2006). With respect to the third prong, Sergeant Lewis, “a 22-year veteran of the Burlington Police Department, testifie[d] that Costello’s volume was ‘not typical, usual, or customary’ for that location, and that he believed the yelling was disruptive for other people using Church Street.” Costello v. City of Burlington, 708 F.Supp.2d 438, 444 (D.Vt. 2010) (emphasis in original). The record provides no reason to doubt the veracity of Sergeant Lewis’s testimony. Considered against the backdrop of our prior holdings, it is clear “officers of reasonable competence could disagree on the legality of [Costello’s] actions,” especially in light of the multitude of uses Church Street must accommodate. Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995) (internal quotation marks and citation omitted). Sergeant Lewis is therefore entitled to qualified immunity.
For the foregoing reasons, I concur.